**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

ROBYN BRAGG,

    Plaintiff,

vs.

SOUTHWEST HEALTH SYSTEM, INC. d/b/a
SOUTHWEST MEMORIAL PRIMARY CARE

    Defendant.

_____

**COMPLAINT**

_____

Plaintiff Robyn Bragg (Employee), by her attorneys, Lynne Sholler and Anthony Edwards of Sholler Edwards, LLC, states as her Complaint as follows:

**NATURE OF THE ACTION**

Employee seeks damages for being fired in retaliation for her actions in furtherance of a False Claims Act (FCA) whistleblower claim. On numerous occasions between April-August 2017, Employee repeatedly complained to Defendant (Hospital) management staff that adding intravenous infusion (IV) start and stop times to patient records retroactively, and by staff other than the nurse administering the IV; and documentation of critical care minute billings were improper; both of which were falsification of the medial record; fraud; could have resulted in double billing to the patient; violated Medicare and Medicaid regulations and coding guidelines; violated medical provider ethical obligations, and were illegal ("Medicare fraud.") Despite

1

Employee's complaints, Hospital management staff allowed the conduct to continue, and Employee was warned management staff was "out to get her." While Employee was on Family Medical Leave (FML), due to these circumstances and other work stress, Employee was told she was being fired due to her alleged disclosure of private patient health information which violated the Health Insurance Portability and Accountability Act (HIPAA). However, Employee's personnel file revealed there was an investigation concluding no HIPAA violation occurred. The Hospital fired Employee because of her ongoing internal complaints to Hospital management about the Medicare fraud, where she acted in furtherance of a FCA whistleblower claim. She also claims she was wrongfully discharged in violation of public policy. Also, Employee claims the Hospital's conduct violated the FML Act (FMLA) and the National Labor Relations Act (NLRA).

## JURISDICTION AND VENUE

1. Subject matter jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3730(h).

2. Venue is proper because the Hospital is located and conducts its business in Colorado, and further, the employment practices claimed to be unlawful were committed in Colorado.

## PARTIES

3. Employee is an individual who, at all times relevant to this Complaint, was and remains, a Colorado resident. She was employed by the Hospital in Cortez, Colorado during all times relevant to this Complaint.

4. At all times relevant to this Complaint, Hospital was a Colorado non-profit corporation which has continuously been doing business and operating a primary care hospital in Cortez, Colorado.

## GENERAL ALLEGATIONS

5. Employee worked as a Registered Nurse for approximately 40 years, as a Hospital employee for 13 years, the last 4 years of which as the Hospital's Health Information Manager, who managed the Hospital's health information management (HIM) staff responsible for medical and billing coding, until she was fired on or about 8/17/17.

6. All United States hospitals, including Hospital, are regulated by the United States Department of Health and Human Services (DHHS). For Hospital to receive funding via reimbursement for Medicare and Medicaid from the DHHS, the Centers for Medicare and Medicaid Services (CMS), a department with DHHS, provides Official Guidelines for Coding and Reporting. The Office of Inspector General (OIG), within the DHHS, oversees the accuracy of records submitted by hospitals receiving CMS funds for patient care to assure submissions are compliant and to prevent health care fraud, waste, and abuse. The OIG requires hospital board oversight to assure legal compliance for all levels of hospital management, including proper medical billing and coding.

7. All United States hospitals, including Hospital, enter into a Corporate Integrity Agreement with OIG for compliance with all DHHS laws, regulations, guidelines and directives to avoid Medicare and Medicaid fraud.

8. Upon Hospital patient (inpatient and outpatient) discharge, the medical record drops to the HIM coding queue. The coding queue analyzes the medical record to assure all documentation required by CMS is included and authenticated. The HIM coding staff assures all documentation is legal, complete, and compliant with coding guidelines. The analysis may require sending the record back to the department to correct, amend, or add missing documentation. The correction, amendment or addition of information is required to be done by the clinician who provided it initially. Once completed, the coders add the appropriate code and forward the record to patient financial services for billing. This process is required by CMS, the American Health Information Management Association, and the American Association of Professional Coders, as well as Hospital coding policy.

## HOSPITAL FALSIFICATION OF IV BILLING

9. In approximately March 2017, Hospital hired consultant, Adam Taylor of Impact Advisor (Taylor), who discovered that Hospital had not charged patients for IV charges since 2014. Taylor and Hospital Chief Financial Officer Angela Kobel (CFO Kobel) advised Employee that Hospital was losing revenue on IV infusions, directing her to research a process whereby Hospital's electronic health record software, Cerner, could add IV fees to patient bills.

10. Employee informed Taylor and CFO Kobel that the IVs may be a "bundled service," already included with the room and bed charge. If it was billed separately, it could result in double charging the patient. Taylor and CFO Kobel insisted the IVs were not bundled services and should be added to patient bills.

11. It was learned that the Cerner software could not automatically populate IV changes; rather, they had to be entered manually.

12. CFO Kobel directed Employee to add the IV charges on patient bills beginning approximately April 1, 2017. To place IV charges for reimbursement by the United States government under the Medicare and Medicaid programs, the CMS sets a strict algorithm: There must be a start and stop time placed by the nurse who administered the drug. Each IV situation can have a different code, based on type of drug administered as well as various increments of time the drug was infused. Thus, the type of drug and time involved requires different coding. The longer the drug was administered, the greater the IV charge.

13. In reviewing patient bills between 4/1/17 to 8/15/17, where IV start/stop times were not indicated, Employee regularly sent screen shots from Cerner with the patient information via email to Inpatient Nursing Director, Janet Knisley (IND Knisley), to have the nurse who administered the IV insert the start/stop times. However, IND Knisley inserted the start/stop times herself, regardless of whether she was the nurse who administered the IV.

14. The Hospital Emergency Department (ED) also did not always have start/stop times indicated correctly. Employee managed HIM coding staff, Linda Becker, Patricia Thomas and Debra Williams, who sent daily spread sheets of IV times needed to ED director Pat Speers (EDD Speers). EDD Speers inserted the start/stop times herself rather than the nurse who administered the IV.

15. Employee's HIM coding staff also advised EDD Speer this process was improper, fraudulent and illegal under federal law regarding submitting bills to the US government for payment under the Medicare and Medicaid program, as well as in violation of CMS regulations and coding requirements.

16. Employee frequently sent emails to IND Knisley, CFO Kobel and Chief Nursing Officer Karen Pasquin (CNO Pasquin) that the IV start/stop times inserted retroactively and by someone other than the nurse who administered the IV violated CMS rules and regulations as well as coding guidelines (AAPC - America Academy of Professional Coders and AHIMA – American Health Information Management Association). The nurse who administered the IV must indicate the start/stop times, having personal knowledge of the infusion; otherwise, another person on a later date is simply guessing, which is falsification of the Hospital medical record submitted for reimbursement to the United States government under the Medicare and Medicaid programs.

17. It is the coders responsibility, including Employee, to assure the medical record is coded correctly, and a false code may result in the loss of Employee's Registered Nurse and HIM Coding Specialist licenses.

18. Hospital engaged in a deceitful, institutional scheme to maximize reimbursement from Medicare and Medicaid reimbursement at the expense of the United States government by submitting bills for reimbursement when IV information was false or inaccurate.

19. Some billings were false because the administering nurse did not document the times when the IV's were performed, on the dates they were administered.

20. Upon information and belief, the Hospital billed the United States Government under the CMS programs for the retroactively inserted IV start/stop times by someone other than the nurse who administered the IVs.

21. On many occasions between April and August 2017, in an attempt to stop the perceived ongoing Medicare fraud, Employee discussed with her direct supervisor, CFO Kobel, that the falsification of the medical record was fraud. CFO Kobel directed Employee to keep documentation sent to nursing managers IND Knisley and EDD Speers, because CNO "Karen [Pasquin] is out to get you."

22. Employee and her staff forwarded emails and spreadsheets reflecting improper IV insertions, believed to be falsified and fraudulent, to CFO Kobel and CNO Pasquin. Yet, CFO Kobel directed Employee to use IND Knisley's and EDD Speer's documentation to add IV charges onto the patient bills submitted to the United States Government for Medicare/Medicaid reimbursement. Fearful of being fired, knowing Hospital staff was "out to get her," Employee complied.

23. In attempts to stop the violations of unlawful CMS billing, Employee provided some of the screen shots/emails of the same to CFO Kobel and preserved them on her Hospital-designated computer in a folder named "Angela."

24. The "Angela" folder, and other documents, were subpoenaed in Employee's unemployment benefits hearing. (Ex. A attached). Upon receipt of the subpoena,

Hospital withdrew its opposition to benefits (Ex. B attached), to prevent Employee from obtaining these documents.

## HOSPITAL FALSIFICATION OF CRITICAL CARE MINUTES

25. Also, between April-August 2017, Employee discovered Hospital critical care minutes (CCMs) sought to be reimbursed by the United States Government under the Medicare and Medicaid programs were not accurately documented and charged to patients. CCMs involve physician's direct time-based care (30-74 minutes and each 30 minutes' thereafter) for a critically ill or injured patient. A critical illness or injury is the acute impairment of one or more vital organ systems where there is a high probability of imminent or life threating deterioration of the patient's condition. Due to emergent situations, critical care is the most highly compensated care paid by Medicare/Medicaid. Critical care must be medically necessary and involve high complex decision making.

26. In order to receive payment by Medicare and Medicaid, Hospital must provide sufficient documentation such as detailed progress notes covering the nature of the illness, list of care components requiring the provider's time, dates, signatures of providers and supervisors, and physician attestation that critical care was provided. Employee discovered CCMs were charged to patients that did not meet CMS criteria.

27. Employee addressed the concerns about CCMs in several meetings attended by CNO Pasquin, EDD Speers, Compliance & Risk Director Laure Boucher (C&RD Boucher), and Compliance & Risk Assistant Lee Unginade.

28. Employee and her HIM coder staff provided Hospital managers/attendees information needed to accurately charge for the CCMs. Employee was tasked with providing further education to the ED staff regarding proper CCM documentation.

29. EDD Speers insisted the ED CCMs were correct and she would conduct the training herself.

30. Because Employee knew CCMs were not documented properly, she asked EDD Speers to send her and C&RD Boucher a list of patients with CCM charges. EDD Speer responded, "I don't know why I have to do that, I am the Director."

31. In Employee's investigation, she asked her HIM coder staff to send her a list of patients with CCMs for review so she could assure accuracy before submitting the CCMs for billing.

32. From time to time C&RD Boucher asked Employee to review bills and documentation from patients who complained about charges, and Employee removed several CCM's that were falsely billed, reducing the patient charges.

33. Employee sent multiple emails to EDD Speers regarding ED Facility Charge Tickets, a tool in Cerner that captured charges based on documentation. If critical care documentation was done properly, the ED Facility Charge Ticket would calculate charges. EDD Speers did not respond to Employee's emails.

34. Employee raised the concern the Emergency Department did not use the Facility Charge tickets at a "Just Culture" workshop, and Employee advised CFO Kobel that EDD Speers refused to respond to Employee's emails. CFO Kobel told Employee to "be careful of Pat [Speers] and Karen [Pasquin] because they're out to get you."

CFO Kobel directed Employee to copy her on emails set to EDD Speers and CNO Pasquin, and Employee complied.

35. Cerner has a training module for the ED Facility Charge Ticket. Yet, EDD Speers refused to use the module, claimed it was the coders' responsibility, it wasn't working, and the Emergency Department had not been trained. Cerner set trainings on the module in October 2016, April 2017 and again in July 2017, but EDD Speers refused to let her staff use the charge ticket, allowing the Emergency Department to bill at a higher rate than allowed under CMS requirements.

36. Hospital engaged in an institutional scheme to maximize reimbursement from Medicare and Medicaid reimbursement by the United States government by submitting bills for reimbursement when CCMs were false or inaccurate.

37. Employee made lawful efforts to stop this practice.

### MEANINGFUL USE MEASURES

38. In July 2017, Employee asked Clinical Informatic Supervisor, Ed Taylor, to help her with Meaningful Use measures. Meaningful Use measures are incentive payments from the federal government for meeting certain documentation measures. The nurses were not meeting the requisite standards to obtain the incentive payments. Employee was in charge of Meaningful Use and submitting all documentation to CMS for reimbursement. But, Employee could not access the clinical information, to which only Ed Taylor had access, so she sought his assistance. He knew what the nurses and providers had to do to meet the standard and Employee needed the information in order to gain the incentive payments for the Hospital.

39. Ed Taylor was put on a performance improvement plan for assisting Employee wherein he was directed "not to help" Employee. Without clinical informatics, Employee could not complete the Meaningful Use documentation on her own, setting her up for failure, for which she could be disciplined or terminated.

## RETALIATION

40. In July 2017—true to the plan to "get rid of" Employee—CNO Pasquin told all Hospital senior leaders at a leadership meeting that Employee falsified the Hospital's medical record. In response, CFO Kobel told Employee she provided leadership with proof from emails Employee sent her that CNO Pasquin's accusation was untrue.

41. On or about July 24, 2017 Employee was placed on FML due to stress overload, handling multiple new tasks by herself, the continued Medicare fraud despite her repeated internal complaints, and the threats and attempts EDD Speer and CNO Pasquin made to get Employee fired.

42. Employee was required to come to work at the Hospital during her FML which hampered her ability to rest and recover.

43. While at work at the Hospital on 8/15/17 during FML, Employee saw a work acquaintance in the cafeteria. Employee heard from a friend—outside of work and without accessing his private health information—that he might have cancer. Employee was in charge of fundraising for the Montelores (two county) Cancer Fund. Employee whispered to the worker about the availability of those funds. A complaint was made alleging Employee's comment about the cancer fund was a HIPAA violation. A Cerner "P2 Sentinel" module would confirm Employee did not

access the worker's private medical records. Employee made no "disclosure" of the workers private health information, and certainly not to any third party.

44. On 8/16/17 Human Resources Director Travis Parker (HRD Parker) and CFO Kobel asked Employee about the HIPAA complaint. Employee described what occurred. She was then directed by HRD Parker and CFO Kobel to return to work the next morning, again, during Employee's FML due to work stress.

45. On 8/17/17 HRD Parker and CFO Kobel told Employee she was being terminated for the alleged HIPAA violation, handing her a termination letter. Stunned by the termination after decades of service, terrified of the consequences that label could have on Employee's career, and under duress, Employee asked if she could resign instead. Parker and Kobel agreed, tore up the termination letter, and dictated a letter of resignation for Employee to type.

46. As permitted by C.R.S. § 8-2--129, Employee obtained a copy of her personnel file. An investigative report dated 8/15/17 regarding the alleged HIPAA violation in her file indicated NO HIPAA violation occurred. There being no HIPAA violation, the termination was due to Employee's actions in furtherance of a FCA whistleblower claim by raising concerns about the Hospital's Medicare fraud.

47. Hospital intimidated, harassed and terminated Employee in retaliation for her actions in furtherance of a FCA whistleblower claim.

## NATIONAL LABOR RELATIONS VIOLATION

48. Hospital circulated an email to all-Hospital staff upon Employee's termination that she had resigned "effective immediately," commonly understood to mean "under threat of termination," causing her humiliation.

49. Employee received numerous calls and text messages from Hospital employees asking what happened. Rather than recounting the painful story multiple times, Employee posted on Facebook what happened to her so others could protect themselves from similar terminations, which had happened to other Hospital employees before her.

50. The Hospital's Grievance Policy provided employees the right to request a meeting to discuss terminations. Employee requested such a meeting with HRD Parker and CFO Kobel.

51. Employee's right to the meeting was denied by CFO Kobel, contrary to Hospital policy. When Employee asked why, CFO Kobel responded "due to recent events." When Employee further asked, "what recent events?" CFO responded, "Facebook."

52. When Employee obtained a copy of her personnel file, there was an email from HRD Parker to CFO Kobel attaching Employee's Facebook post. It was the only Facebook post in her personnel file.

53. Employee was denied her rights to the grievance process because she engaged in a concerted activity with other Hospital employees regarding Hospital-forced terminations based on false accusations.

**FIRST CLAIM FOR RELIEF**
**(False Claims Act Retaliation)**

54. Employee incorporates all prior allegations as if set forth here.

55. The FCA, 31 U.S.C. § 3730 (h)(1) entitles all employees to relief who are discharged, threatened, harassed, or otherwise discriminated against in the terms and conditions of employment due to their lawful acts done in furtherance of reporting a false claim to the federal government.

56. Relief under 31 U.S.C. 3730(h)(2) includes reinstatement with the same seniority status the employee would have had but for the discrimination, twice the back-pay amount, interest on the back-pay, and special damages resulting from the discrimination, including reasonable attorneys' fees and costs of suit.

57. Between approximately 4/1/17 through 8/15/17 Employee repeatedly engaged in lawful, protected activity to stop Hospital from submitting falsified documents seeking payments from the United States government under the Medicare and Medicaid programs. In doing so, Employee, along with her HIM staff, advised various Hospital management staff that certain billing practices described above constituted Medicare fraud, involving falsified medical records, which were unlawful and unethical practices.

58. Hospital management staff knew of Employee's efforts in furtherance of a FCA whistleblower action regarding the Medicaid fraud. Employee engaged in numerous conversations with her supervisor, CFO Kobel about the same; Employee documented the results of her investigation in a computer folder called "Angela;" and Employee communicated about Medicare fraud with CFO Kobel, IND Knisley, EDD Speers and CNO Pasquin, using various words such as "improper, fraud, falsified, illegal, unethical, violating CMS regulations and coding protocol." These clear and

specific words put Hospital on notice that Employee and her HIM staff were taking efforts in furtherance of a FCA whistleblower action.

59. CFO Kobel twice warned Employee that IND Knisley and CNO Pasquin were "trying to get rid of" her. Hospital staff further threatened and harassed Employee by refusing to provide her adequate information and assistance to complete additional her job duties, in order to set her up to fail to justify termination; and directed her to come to work during her FML when she needed time off due to workplace stress.

60. Employee was threatened and harassed by Hospital due to her actions in furtherance of a FCA whistleblower claim in violation of 31 U.S.C. § 3730(h).

61. On 8/17/17 Hospital fired Employee, a long-term employee, on fictitious, trumped up, and defamatory allegations of a HIPAA violation when it knew no such violation occurred: The real reason Hospital was "trying to get rid of" Employee was her multiple attempts to prevent and stop the Medicare fraud in violation of 31 USC § 3730(h).

62. Despite Employees repeated internal complaints about the improper billing practices that constituted Medicare fraud, the Hospital continued its improper practices in order to maximize revenue from the United States government.

63. Employee has been harmed by Hospital's wrongful conduct in firing her for raising legal concerns she had about Hospital billing practices, and her attempt to comply with all U.S. government and CMS requirements.

### SECOND CLAIM FOR RELIEF
(Wrongful Discharge in Violation of Public Policy)

64. Employee incorporates all prior allegations as if asserted here.

15

65. Employee acted lawfully in furtherance of reporting Hospital's false claims for Medicare reimbursement to the United States government, and to stop these false claims which caused financial losses to United States government via the Medicare program, which may result in overcharges to patients, and ultimately incur costs to American taxpayers.

66. The FCA, 31 U.S.C. § 3729(a)(1), prohibits all fraudulent attempts to cause the United States government to improperly pay out sums of money related to health care, which is related to public health, safety, and/or welfare.

67. Public policy pursuant to the FCA prohibits hospitals from submitting false Medicare claims for reimbursement. The FCA provides an avenue for citizens and employees to report false claims to the United States government.

68. Public policy requires hospitals to promote and comply with MCS regulations and directives. 42 C.F.R. §§ 503 and 504.

69. It is unlawful for Employer to undermine express public policy relating to Employee's basic responsibility as a worker and citizen to report Medicare fraud.

70. Employee should not be forced to violate the law by obeying Hospital's directive to allow false Medicare claims to be submitted for payment by the United States government or lose her job.

71. Employee reasonably believed certain claims Hospital made for Medicare reimbursement were false.

72. Hospital was aware Employee believed her complaints about Hospital's submission of false Medicare reimbursement claims were fraudulent and illegal, which violated

public policy, and for which Employee had a duty as a citizen and a licensed nurse and HIM manager to report.

73. Employee suffered retaliatory termination by Hospital for having exercised a specific right as a worker and a citizen, by performing her public duty to attempt to stop Hospital's submission of false Medicare claims to the United States government for payment.

### THIRD CLAIM FOR RELIEF
(FMLA Violation)

74. Hospital was an "employer" as defined by the FMLA.

75. Employee was eligible to take FML.

76. Employee gave Hospital proper notice of her need to take FML.

77. Per 29 U.S.C. § 2614(a)(1), 29 C.F.R § §825.214 and 825.215, upon return from FML, an employee must be returned to her prior or equivalent position with equivalent pay, benefits, terms and conditions.

78. Hospital violated FLMA by interfering with Employee's FML by requiring her to come to work during FML, when rest from extensive work stress was necessary.

79. Hospital violated FMLA by firing Employee for a fake reason during her FML and preventing her to return to work under the same work terms and conditions at the end of FML.

80. Employee was harmed by Hospital's FMLA violations, by being required to come to work during FML, and further, by being fired during FML prior to reinstatement.

### THIRD CLAIM FOR RELIEF
(National Labor Relations Act "NLRA" Violation)

17

81. Employee incorporates all prior allegations as if asserted here.

82. Under Section 7 of the NLRA, employees are entitled to "the right to self-organization. . . to engage in other concerted activities for the purposes . . . of . . . mutual aid or protection . . . ." 29 U.S.C. § 157.

83. Section 8(a)(1) of the NLRA makes it unlawful for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7]." 29 U.S.C. § 158(a)(1). Stated differently, an employer violates Section 8(a)(1) if it maintains workplace rules that would reasonably tend to chill employees' exercise of their Section 7 rights.

84. Employee's Facebook post sought to improve Hospital employees work conditions: She acted in a protected and concerted activity for their mutual benefit to protect them from forced terminations based on false allegations, which could be career ending, and which happened to prior Hospital employees.

85. Employee was denied her rights to the Hospital grievance policy to contest her termination because of the Facebook post which was protected concerted activity under the NLRA.

86. Employee was harmed by the denied of her right to contest her termination under the Hospital's policies, and in violation of the NLRA.

### RELIEF REQUESTED

Wherefore, Employee respectfully requests the Court:

   A. Enter judgment in her favor and against Hospital for all appropriate damages, to the fullest extent allowable by law, including back wages, double back

wages, interest on back wages, and special damages, including but not limited to emotional damages, future damages, punitive damages, attorney fees and costs;

B. Order the reinstatement of Employee to the Hospital as HIM Manager at her prior seniority, salary, and benefits—with applicable adjustments had she not been wrongfully terminated—without future harassment, intimidation and retaliation; and

C. For such further relief as the Court deems necessary and proper.

Dated: April 2, 2018.

        Sholler Edwards, LLC.

        *s/ Lynne Sholler*
        1099 Main Avenue, #409
        Durango, CO 81301
        855-649-5884
        Lynne@ShollerEdwards.com

        Sholler Edwards, LLC
        s/ Anthony Edwards
        1099 Main Avenue, #409
        Durango, CO  81301
        855-649-5884
        Anthony@ShollerEdwards.com