IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger

Civil Action No. 18-cv-00763-MSK-NRN

ROBYN BRAGG,

    Plaintiff,

v.

SOUTHWEST HEALTH SYSTEM, INC.,

    Defendant.

_____

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**
_____

**THIS MATTER** comes before the Court primarily pursuant to the Defendant's ("SHS") Motion for Summary Judgment **(# 88)**, Ms. Bragg's response **(# 97)**, and SHS' reply **(# 111)**. Also pending are several motions seeking to restrict access **(# 89, 99, 107, 140, 145, 164)**; motions by both sides to exclude the testimony of the opposing side's expert under Fed. R. Evid. 702 **(# 124, 125)**; and various other matters that will be addressed as necessary.

**FACTS**

The Court briefly summarizes the pertinent facts here and elaborates as necessary in its analysis. Ms. Bragg was employed by SHS as its Director of Health Information Management. Generally speaking, her duties as Director required her to supervise a team of employees who "coded" the medical services provided by employees of SHS for submission to patients' medical insurance companies. Ms. Bragg's direct supervisor was Angela Kobel, SHS' Chief Financial Officer.

1

In December 2016, a subordinate of Ms. Bragg's complained that she had sexually harassed him and created a hostile working environment. Although Ms. Bragg believes the complaint was meritless, it is undisputed that SHS investigated the matter and that based on the investigation, Ms. Kobel determined that Ms. Bragg had acted inappropriately and placed her on a 90-day Performance Improvement Plan ("PIP"). In February 2017, SHS received a complaint from a patient that Ms. Bragg had breached patient privacy rules when she spoke to a patient in a supermarket, congratulating the patient on a positive pregnancy test. The patient, who was in the presence of her estranged husband and did not wish to disclose the pregnancy, denied that anything warranted congratulations, and Ms. Bragg persisted, telling the patient that she had personally "coded your lab" results. Once again, Ms. Bragg disputes certain aspects of the complaint, but does not contest that SHS determined that she committed an "unintentional" violation of privacy rules. SHS issued a written warning, stating that any future violation "will result in immediate termination of employment." SHS also removed Ms. Bragg from certain duties that affected patient privacy rights.

In March 2017, SHS conducted a review of its billing practices relating to IV infusion treatments and concluded that the failure of nurses to record start and stop times for such treatments was preventing SHS from fully billing for those services. Thus, SHS directed that nurses began entering start and stop times for the treatments in medical records. It appears that those times would sometimes be entered by nurses other than those who were actually administering the IV treatments, a practice that Ms. Bragg believed was improper and unethical, possibly amounting to fraud. Ms. Bragg repeatedly reported these concerns to Ms. Kobel and other supervisors at various times between April and August 2017.

In August 2017, Ms. Bragg was the subject of another patient privacy complaint. Because this incident is of substantial consequence in the analysis, the Court explores it in somewhat greater detail. On August 15, 2017, an SHS patient (and co-worker of Ms. Bragg's), whom the Court will identify only as "C" called an SHS complaint hotline. In that call, C stated that on that date, he and Ms. Bragg "were both getting their lunch in the cafeteria." Ms. Bragg "came up to [C] and whispered in his ear . . . that she noticed [C] had a rare form of liver cancer and he can get a $1,000 grant for it" from a cancer-relief foundation with which Ms. Bragg was involved. C "stated that he did not know what [Ms. Bragg] was talking about and she said she must have mistaken him for the wrong person." Later, C was "notified that his lab work was back and it wasn't tested for cancer at all." C was upset because this "violates his privacy" and that Ms. Bragg "had no right to interact with him about this issue, she is not his doctor."

C's complaint was investigated by Travis Parker, SHS' Human Resources Director and Lee Ungnade, SHS' HIPAA Privacy Officer. They first interviewed C. He explained that he had been receiving treatment from his doctor, Dr. Henderson, for a condition known as "fatty liver," but had not been informed of any concerns about potential liver cancer. C told his wife about the interaction with Ms. Bragg, and his wife contacted Dr. Henderson for clarification. Dr. Henderson called C back, and "was furious about the incident," that she had just gotten C's most recent lab results back, and that "everything was fine." C stated that when he told Ms. Bragg that she must have been mistaken, she responded "don't tell anyone about this."

They then interviewed Ms. Bragg. According to Ms. Ungnade's report of that interview, Ms. Bragg stated that she knew C indirectly through social connections and that she most recently saw him at a birthday party in July. She stated that she "has been coding [C]'s lab work" as part of her official duties, but she denied that she had accessed the actual lab results.

3

She stated that she had whispered to C that "she'd be happy to help him get a grant from the Cancer Fund because she does a lot of work with the Fund," but she also stated that she "did not remember saying anything about liver cancer, [and] she was trying to be nice." Ms. Bragg denied telling C "don't tell anyone about this," but she asked Ms. Ungnade "if she could lose her job" as a result of the incident. (Ms. Ungnade told her "it was a possibility.") Ms. Ungnade then reviewed SHS' computer records to confirm Ms. Bragg's assertion that she only coded C's lab tests, but did not access the actual test results. The records confirmed that on August 6, 2017, Ms. Bragg had coded an entry for C for "lab testing of the liver," but Ms. Ungnade ultimately concluded that "no labs were seen" by Ms. Bragg. Ms. Ungnade concluded that because actual test results were not disclosed, the situation was not "a HIPAA issue," but rather a "code of conduct, Human Resources issue."

The record indicates that the matter was turned over to Ms. Kobel and Mr. Parker for consideration, and they jointly[1] concluded that, in light of Ms. Bragg's prior discipline, including the patient privacy breach from February 2017, that termination of her employment was appropriate. On August 17, 2017, Ms. Kobel wrote to Ms. Bragg stating that "there have been three separate complaints and subsequent investigations regarding inappropriate actions and HIPAA concerns regarding your actions" and that "SHS no longer has faith in your abilities to

---

[1] Mr. Parker testified that "ultimately, it was [Ms. Kobel's] decision and responsibility as the senior leader to – to terminate." Thus, the Court will assume that Ms. Kobel was the sole decisionmaker for purposes of Ms. Bragg's termination.

Ms. Bragg's briefing argues that Kent Rogers, SHS' CEO, "participated in the decision to fire [Ms.] Bragg." *Docket* # 97 at 40. But none of the citations supporting that assertion stand for the proposition that Mr. Rogers had any input into the termination decision. Ms. Kobel testified that the decision was made by "[Mr. Parker] and I together." Mr. Parker testified that Mr. Rogers "was fully apprized [sic] of the investigation" into C's allegations, but he did not testify that Mr. Rogers gave any input into the decision to terminate.

4

function in an acceptable manner." Ms. Bragg offered to resign in lieu of termination, and Ms. Kobel accepted Ms. Bragg's resignation that same day.

Ms. Bragg then commenced this lawsuit, alleging several causes of action **(# 1)**, but the only claim[2] that still remains is her claim for retaliation under the False Claims Act, 31 U.S.C. §3730(h), in that her complaints to superiors of improprieties relating to the entry of start and stop times for IV treatments (and certain other billing-related matters) constituted protected activity under that act, and that her termination was imposed in response to such complaints.

SHS moves **(# 88)** for summary judgment on Ms. Bragg's False Claims Act claim, arguing that: (i) Ms. Bragg's complaints do not constitute protected activity under the Act because she did not possess an objectively reasonable belief that the actions by the nurses was fraudulent; (ii) Ms. Bragg did not provide SHS with formal notice of her concerns of fraud and that her general complaints to supervisors were insufficient to provide the level of notice required by the Act; and (iii) Ms. Bragg cannot show that her protected activity was a but-for cause of her termination, given that she committed a second patient privacy violation after having committed a similar violation prior to any protected activity and that she had been warned that any future privacy violations would result in termination.

## ANALYSIS

### A. Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and

---

[2]     Ms. Bragg has a pending motion **(# 110)** to voluntarily dismiss a second pending claim that asserts wrongful discharge in violation of public policy. The Court grants that motion and dismisses that claim.

a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie*

6

claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### B. False Claims Act

The False Claims Act provides a remedy for "any employee [who is] discharged, demoted . . . or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under [the Act] or other efforts to stop 1 or more violations [of the Act]." 31 U.S.C. § 3730(h)(1). Retaliation claims under this statute are analyzed according to the familiar *McDonnell-Douglas* burden-shifting framework used in retaliation claims under other non-discrimination statutes. Ms. Bragg bears the burden of first demonstrating a *prima facie* case of retaliation by showing that: (i) she engaged in activity protected by the Act; (ii) the decisionmaker knew of that activity; and (iii) that there is basis to believe that her termination occurred because of that protected activity. If she carries that burden, SHS has the obligation to proffer a legitimate, non-retaliatory reason for the termination, and Ms. Bragg bears the ultimate burden of demonstrating that SHS' proffered reason is a pretext and that but-for her protected activity, she would not have been terminated. *Miller v. Institute for Defense Analyses*, 795 Fed.Appx. 590, 595-96 (10th Cir. 2019).

Ms. Bragg's complaints about SHS' billing practices can be divided into two major strands. First, Ms. Bragg believed that "[i]f I'm the nurse that administered [a] drug" intravenously, "I need to be the nurse that documented [the start and stop times of] that drug," and that if someone else documents those times, "that's fraud." Ms. Bragg made it clear that she believed that this was the case even if "another nurse asked the administering nurse 'how long did this take?' and then entered the information," because "another nurse cannot document

7

something they didn't do." Ms. Bragg also believed it would be fraudulent if the administering nurse entered a stop time at some point other than contemporaneously with the end of treatment, without specifically noting it as a "late entry." (Ms. Bragg testified that the nurse's state of mind was irrelevant to the question of whether fraud had occurred.) When Ms. Bragg found records that did not contain a start or stop time for an IV treatment, she would refer it back to the nursing supervisors for completion. If Ms. Bragg determined that the start or stop times were entered by a nurse other than the one administering the treatment, she would again contact the nursing supervisors and ask that the correct nurse enter the relevant information. Sometimes the supervisors would comply and the record would be clarified; other times, the supervisor would refuse. Ms. Bragg contacted Ms. Kobel and Karen Pasquin, SHS' Clinical Director, on a weekly basis with a spreadsheet of data showing what she believed to be improperly-recorded IV start and stop times. Although the record is not entirely clear, it appears that Ms. Kobel or Ms. Pasquin would sometimes support Ms. Bragg and direct the nursing staff to correct the errors. Other times, it appears that Ms. Kobel would direct Ms. Bragg to nevertheless code the treatment in a particular way and, presumably, Ms. Bragg would comply.

Second, Ms. Bragg believed that SHS sought to bill some services as "critical care minutes," payable at a premium rate, when the services did not meet the criteria for such a designation. Each week, Ms. Bragg and Laurie Boucher would review the charges that SHS designated as critical care. If they felt that the documentation justifying the charges was not sufficient, they would identify the charge on a spreadsheet that they provided to Ms. Kobel and Ms. Pasquin. On occasion, Ms. Bragg's belief that a critical care charge was not sufficiently documented would be "argued and argued and not fixed," and eventually, Ms. Bragg would be told that "you just need to charge for it." She considered such instruction to require her to

engage in fraud. She states that she was criticized by Ms. Kobel and Ms. Pasquin for doing so because they "thought it was [not] our jobs" as coders "to look at those critical care minutes."

Ms. Bragg identified an exemplar e-mail that she would send to Ms. Kobel and others along with the weekly spreadsheet of improper charges. As described by Ms. Bragg, the e-mails basically said "Charges were incomplete, charges inaccurate, charges too high. [Nursing supervisors] changed IV start and stop times again. I can't bill as documented. I can't code as documented." Ms. Bragg acknowledged that she did not use the word "fraud" in these e-mails, stating that "we were threatened not to use the word fraud." The reference to being instructed not to use the word "fraud" appears to relate to a date in June or July of 2017, when there was a meeting involving Ms. Bragg, some of her subordinate coders, and Ms. Kobel to discuss "all of the charges, all of the illegal things that we saw in coding." According to Ms. Bragg, "one my coders brought up the word fraud and you could see the hair raise on people in that room. Directly after that meeting, [Ms. Kobel] . . . said Do not use the word fraud; I never want to hear that word again or Kent Rogers [SHS' CEO] will have your neck." Ms. Bragg responded to Ms. Kobel that "if we can't use the word fraud, then I am filing a report with [a Medicaid review agency]. This is illegal." (Ms. Bragg states that she did make an anonymous report to the review agency, but is not aware of what became of that complaint. She did not tell Ms. Kobel that she actually filed a complaint and there is no indication that Ms. Kobel actually knew of such a complaint being filed.) However, it is essentially undisputed that Ms. Bragg's e-mails to Ms. Kobel and Ms. Pasquin, both before and after this meeting, did not expressly contend that SHS was engaged in any kind of "fraud."[3]

---

[3] Ms. Bragg testified that she used the word "fraud" in at least one compliance report that she intended to deliver to the hospital's compliance board, but that John Brooks, the hospital's attorney, removed the use of that word before approving the report for distribution to the

Ms. Bragg made an anonymous call to SHS' compliance hotline in April 2017, complaining of "coding and billing issues that are being reported to senior leadership" that were being ignored, but she did not provide her name, the names of the leadership involved, or any other details. The record does not reflect who, if anyone, received her complaint or what, if anything, was done with it.

Based on the foregoing, the Court will bypass SHS' arguments directed at whether Ms. Bragg's conduct of reporting her concerns about improper recordkeeping constitutes "protected activity" under the False Claims Act, and instead will assume for purposes of this motion that it does. Based on such assumption, Ms. Bragg has adequately set forth a *prima facie* case of retaliation, in that she engaged in protected activity beginning in or about March 2017 and continuing through August 2017; that she suffered an adverse employment action by being terminated on August 17, 2017; and that an inference of causation can be drawn between those two facts because, among other things, the adverse action followed closely in time to Ms. Bragg engaging in the protected activity.

The burden then shifts to SHS to articulate a non-retaliatory reason for Ms. Bragg's termination, and it has done so, stating that Ms. Bragg was terminated as a result of the incident with C, following prior instances of misconduct, one of which also involved an inappropriate disclosure of patient information.

At this juncture, the question becomes whether Ms. Bragg can demonstrate that SHS' proffered reason – the August 2017 incident with C and her cumulative disciplinary record – is not the true reason for her termination but instead pretext for retaliation against her. To establish

---

committee. However, based on Ms. Bragg's recollection of collateral details, it appears that this event would have occurred prior to 2016, and thus, could not have related to the IV start and stop time issue.

that an employer's proffered reason for an adverse action is pretextual, an employee must point to weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered reason, such that a reasonable factfinder could rationally find it unworthy of credence and hence infer that the employer did not act for the asserted reason. *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1059 (10th Cir. 2020). However, the Court must be mindful that its goal is not to attempt to determine the objective reality of whether Ms. Bragg engaged in misconduct or not, but rather, to attempt to ascertain the subjective impressions of the decisionmaker – Ms. Kobel -- at the time the decision to terminate was made. Because Ms. Bragg must ultimately prove that Ms. Kobel acted with a retaliatory purpose, she must not only show the objective fact that she did not engage in misconduct when talking to C about his liver condition, but also that Ms. Kobel had no honest, if perhaps mistaken, belief that Ms. Bragg <u>had</u> engaged in misconduct. *See DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 971 (10th Cir. 2017). In other words, even if Ms. Kobel's belief that Ms. Bragg had acted improperly when talking to C was factually incorrect, and/or the decision to terminate Ms. Bragg's employment was unwise, unfair or a poor exercise of business judgment, such conclusions are insufficient to demonstrate pretext by SHS. To be sufficient to demonstrate pretext, Ms. Bragg must show that Ms. Kobel did not even believe the reason she gave for Ms. Bragg's termination. *Id.*

Ms. Bragg has not come forward with evidence that suggests that Ms. Kobel did not believe that the incident with C was an appropriate basis for Ms. Bragg's termination. Ms. Bragg disputes certain collateral aspects[4] of the conclusions SHS reached about the incident

---

[4] According to Ms. Bragg's deposition testimony, at a birthday party in July, C's wife told Ms. Bragg that C "was ill" – she did not mention cancer – and "that he might be ashamed to ask for any funding" from the "cancer fund." (Ms. Bragg testified that "you didn't have to have cancer" to be eligible to receive grants from this fund.) C's wife asked that Ms. Bragg "mention it to him[ ] that he could get a thousand dollars to help offset medical expenses." She states that

11

involving C, but she does not dispute the fundamental facts - that she spoke to C about medical treatment he was receiving, based on information that she obtained through her job duties coding C's medical records. Although SHS determined that the incident did not implicate HIPAA privacy rules, it is clear that Ms. Kobel believed that Ms. Bragg's actions constituted a poor judgment consonant with her conduct in February 2017 that resulted in discipline. Ms. Kobel testified in her deposition that "after the last time" – the February 2017 incident in which she disclosed knowledge of a patient's health status – "the decision was made if it happens again, that we would just have to terminate. . . we would have to end our relationship because it just keep happening." Ms. Kobel testified that it did not matter that the incident with C was not technically a HIPAA violation, but rather "it was the fact that it happened again, that there was another complaint that violated policy, per se, that she approached someone else and it happened again." Because Ms. Bragg has not come forward with evidence to suggest that Ms. Kobel was disingenuous in stating that she thought the two incidents were similar and in light of the prior discipline, termination of Ms. Bragg's employment was appropriate. Accordingly, Ms. Bragg has failed to demonstrate a triable issue of fact as to whether SHS' proffered reason for her termination is pretextual.

Ms. Bragg argues that Ms. Kobel's retaliatory intent can be inferred through a collection of scattered facts. It is undisputed that Ms. Bragg made regular complaints to Ms. Kobel about

---

she then approached C on August 15 and said "I heard you were sick" and that he "could get a grant through the Cancer Fund." Ms. Bragg did not deny making any of the statements that Ms. Ungnarde's investigative report attributes to her.

At one point, Ms. Bragg testified that C's doctor, Dr. Henderson, spoke to Ms. Bragg. According to Ms. Bragg, Dr. Henderson told her that C had called, that he stated that Ms. Bragg had told him that he had a "rare form of liver cancer," and that she thought "that [C] had blown it totally out of proportion." Ms. Bragg also testified that Dr. Henderson stated that she "believed that [C] was lying about" what Ms. Bragg had said to him. Later, she clarified this assertion to withdraw reliance on the word "lie" – she stated that Dr. Henderson "said she told me she wished she had talked to me first, because [C] had blown the situation out of proportion."

improper billing practices relating to critical care minutes and IV start and stop times. Actually, thee record reflects that, to some degree, Ms. Kobel <u>encouraged</u> Ms. Bragg's complaints on these issues and actually instructed her to keep copies of the documentation she had of her complaints. Ms. Bragg believes that Ms. Kobel "was trying to cover her ass and blame [Ms.] Pasquin" for any improprieties, so Ms. Kobel instructed Ms. Bragg to follow Ms. Pasquin's instructions to code the entries as Ms. Pasquin directed and "to keep a file of that." Indeed, with one exception, the record does not reflect Ms. Kobel ever raising an objection to or discouraging Ms. Bragg's complaints about improper billing. The single exception occurred in a meeting in June or July 2017 when one of Ms. Bragg's subordinates suggested that the improper billing constituted "fraud" and Ms. Kobel instructed her that "I never want to hear that word again or Kent Rogers will have your neck." But even that statement is ambiguous regarding <u>Ms. Kobel</u>'s intentions, as she appears to be warning Ms. Bragg that <u>Mr. Rogers</u> would retaliate against Ms. Bragg if he learned she was making accusations of fraudulent billing,[5] not necessarily suggesting that Ms. Kobel shared that attitude.[6] Indeed, although Ms. Bragg made complaints directly to Ms. Kobel for more than five months and the two frequently exchanged e-mails about the issues, Ms. Bragg can point to no instance in which Ms. Kobel expressed her own intention to discourage Ms. Bragg's complaints, warned Ms. Bragg against continuing to make them, or otherwise manifested any displeasure with Mr. Bragg's actions. In these circumstances, the Court cannot find that a single instance of Ms. Kobel ostensibly relaying Mr. Rogers' stance on the issue of fraud is enough to create a genuine issue of fact as to whether Ms. Kobel did not subjectively

---

[5]   Ms. Bragg does not point to any evidence that suggests that Mr. Rogers had any input into the decision to terminate her.

[6]   Ms. Bragg testified that, on another occasion, Ms. Kobel told her "you need to cool your jets because [Ms. Pasquin]'s out to get your job." Once again, the record reflects that Ms. Kobel was relating someone else's dislike of Ms. Bragg, not purporting to express her own opinions.

believe that the incident involving C was a separate and sufficient justification for Ms. Bragg's termination.

The remainder of Ms. Bragg's arguments focus on facts that are of even more remote significance.  There has been much litigation over the question of whether, after Ms. Bragg's termination, SHS officials sought to delete certain records from Ms. Bragg's work computer in violation of a litigation hold letter sent by  Ms. Bragg's attorney.  As described by Ms. Bragg, the records in question are the various spreadsheets she sent to Ms. Kobel, reporting improper IV start and stop times, as well as Ms. Kobel's e-mailed responses, sometimes directing Ms. Bragg to nevertheless code and bill the IV treatments.  Ms. Bragg suggests that SHS has engaged in spoliation and that an inference that its proffered reason for her termination is pretextual should be drawn as a result.  (Or, alternatively, that the destruction of evidence is probative of SHS' culpable state of mind regarding the termination.)  But Ms. Bragg does not contend that any of the information allegedly deleted is probative of the central issue to be determined - Ms. Kobel's motivations in deciding to terminate Ms. Bragg's employment.  Ms. Bragg does not allege, for example, that the deleted materials include e-mails from Ms. Kobel threatening to retaliate against Ms. Bragg for complaining of fraud or indicating that Ms. Kobel did not believe C's allegations.  Ms. Bragg has not even suggested that Ms.. Kobel was personally involved with the decision to delete any data. The Magistrate Judge found that no data was improperly deleted by SHS.  This Court finds no error in that finding.  However, even if the described data had been improperly deleted, there is no evidence that the instruction to do so came from Ms. Kobel or that its deletion had anything to do with this litigation. Indeed, there is not showing that the allegedly destroyed data is probative of  Ms. Kobel's subjective intent when she decided to terminate Ms. Bragg's employment.

14

Ms. Bragg also argues that there were procedural irregularities with the termination of her employment, in particular that Ms. Kobel did not read the investigation report regarding the incident with C (she testified that she was instead briefed on the investigation and its findings by Mr. Parker), that her termination contravened SHS' disciplinary process in various ways, that the incident with C did not involve a documented HIPAA violation, such that the final warning Ms. Bragg received from the February 2017 incident would not technically have applied.  Assuming, without deciding, that these irregularities could be proven, they do not show pretext in Ms. Kobel's decision. It is undisputed that Ms. Bragg had been disciplined for carelessly disclosing patient information in February 2017, and that she did so again in August 2017.   In such circumstances, the Court cannot say that arguable deviations from a corporate policy – one whose normal application is not discussed in the record – suffice to create a genuine issue of fact on the issue of pretext.

Finally, the Court addresses the situation of Ms. Pasquin.  Beginning in the summer of 2017, Ms. Pasquin also concluded that SHS "was engaging in Medicaid and Medicare fraud," and Ms. Pasquin reported her concerns to Mr. Rogers.  Ms. Pasquin was ultimately terminated by SHS in February 2018, and she, too, believes that her termination was unlawful retaliation for her complaining of fraud.  But the circumstances of Ms. Pasquin's termination do not shed any light on the true reasons for Ms. Bragg's termination because the record does not indicate that Ms. Kobel was the decisionmaker in Ms. Pasquin's case.  To the contrary, to the extent the record discloses anything about the person who decided to terminate Ms. Pasquin's employment, it appears to have been Mr. Rogers.  But Mr. Rogers was not involved with the decision to terminate Ms. Bragg, and thus, any retaliatory intent Mr. Roger's may have indulged in Ms.

Pasquin's termination is irrelevant to the question of whether Ms. Kobel harbored retaliatory animus towards Ms. Bragg several months earlier.[7]

Accordingly, because Ms. Bragg has not come forward with evidence sufficient to warrant a trial on the question of whether SHS' reason for her termination is a pretext for retaliation, SHS is entitled to summary judgment on her False Claims Act claim.

### C. Remaining issues

#### 1. Rule 702 issues

Docket #124 and #125 are motions pursuant to Fed. R. Evid. 702, addressing each side's computer forensics experts. Those experts would testify regarding the issue of whether information on Ms. Bragg's work computer was deleted by SHS after her termination. Because the Court grants summary judgment to SHS on the remaining claim by Ms. Bragg, these motions are denied as moot.

#### 2. Spoliation issue

Ms. Bragg moved **(# 133)** for a finding that SHS engaged in spoliation by deleting evidence from her work computer following her termination, requesting both trial sanctions and an award of attorney fees. Following an evidentiary hearing involving some live testimony and some deposition designations, the Magistrate Judge denied **(# 166)** Ms. Bragg's motion. Ms. Bragg filed timely Objections **(# 176)** to the Magistrate Judge's order, and those Objections remain pending. Separately, SHS filed a Motion for Sanctions **(# 172)** pursuant to Fed. R. Civ.

---

[7] Ms. Pasquin's affidavit also recites an incident in July 2017 in which Ms. Kobel "told Ms. Bragg that [Ms. Pasquin] accused Ms. Bragg of engaging in Medicaid and Medicare fraud." Taking this contention as true – that Ms. Kobel falsely told Ms. Bragg that Ms. Pasquin had made an accusation against her – it might demonstrate that Ms. Kobel harbored animosity towards Ms. Pasquin, but it does not demonstrate that Ms. Kobel harbored any retaliatory animus against Ms. Bragg.

P. 11, arguing that Ms. Bragg's initial Motion for Spoliation Sanctions was itself frivolous and sanctionable. That motion, too, remains pending.

In light of the discussion above, the Court finds that these issues have largely been rendered moot. The question of whether SHS destroyed evidence after Ms. Bragg's termination is one that is largely irrelevant, given that the allegedly-destroyed evidence does not bear on the issues upon which the Court has granted summary judgment to SHS. Any evidentiary sanctions that would flow from a finding of misconduct by SHS would now be moot. And while issues of potential monetary sanctions against parties for misconduct are collateral issues that survive independently of the dismissal of substantive claims, the Court is reluctant to devote substantial additional resources to resolving conflicting sanctions motions relating to an issue that was of only tangential evidentiary value in the first place.

Nevertheless, were the Court to reach these matters on their merits, the Court would find that Ms. Bragg's Objections fail to demonstrate that the Magistrate Judge's overarching finding – that Ms. Bragg was not demonstrated that information relevant to the issues in this action were deleted by SHS – is not clearly erroneous or contrary to law under Fed. R. Civ. P. 72(a). The material Ms. Bragg stored in the "Angela" folder and that was allegedly deleted addresses what is ultimately an undisputed fact: that Ms. Bragg made frequent complaints to Ms. Kobel about improper recording of IV start and stop times and other matters. Ms. Bragg has not identified any allegedly-deleted e-mail that purportedly contained a threat from Ms. Kobel to Ms. Bragg to stop reporting any alleged fraud or any other material that would suggest that Ms. Kobel's decision to terminate Ms. Bragg for the incident involving C was a pretext for retaliation. Thus, even if data were deleted improperly by SHS, that data would not have been relevant. Accordingly, the Court would overrule Ms. Bragg's Objections.

The Court would also deny SHS' motion for sanctions. At bottom, SHS' motion argues that Ms. Bragg's sanctions motion lacked evidentiary support because allegations by Ms. Bragg and others were not <u>credible</u>, not because those factual allegations did not exist. Ms. Bragg was adamant that she placed more e-mails in the desktop "Angela" folder than SHS eventually produced, and although SHS disbelieves that assertion (and, ultimately, so did the Magistrate Judge), Ms. Bragg's own assertions provided a sufficient evidentiary basis for her motion. Likewise, although Ms. Bragg's expert's opinions regarding the potential deletion of data from her computer were not ultimately credited by the Magistrate Judge, the Court cannot say that Ms. Bragg's position that data on her computer was altered after SHS received a litigation hold letter is so bereft of factual support as to warrant sanctions for her filing the spoliation motion. Thus, the Court would deny SHS' motion for sanctions as well.

2. <u>Motions for Leave to Restrict</u>

Both parties have filed motions **(# 89, 99, 104, 107, 140, 145, 164)** to restrict public access to various materials filed in this case. The Court has some doubt as to whether the parties' showings suffice, particularly under D.C. Colo. L. Civ. R. 7.2(c)(4) (requiring a showing that less-restrictive alternatives, such as redaction of private information, cannot suffice to adequately protect privacy interests). However, the Court agrees with the parties that several of the requested exhibits attached to the parties' summary judgment briefing contain personal-identifying health information, and thus, the Court grants the motions at Docket # 88 and 99. The Court denies the motions at Docket #104 and 107, which seek to restrict access to additional documents attached to Ms. Bragg's summary judgment response (as supplemented), as the Court finds that there has not been an adequate showing that the documents at issue implicate privacy concerns that overcome the public's right of access. The Court denies as moot the motions at

Docket #140, 145, and 164, as those motions seek to restrict access to materials relating to the sanctions issue that this Court did not ultimately address.

## CONCLUSION

For the foregoing reasons, SHS' Motion for Summary Judgment **(# 88)** is **GRANTED**. The Clerk of the Court shall enter judgment in favor of SHS on Ms. Bragg's remaining claim. The motions to restrict at **(# 89, 99)** are **GRANTED** and the documents subject to those motions shall remain at the same Level 1 restriction under which they were provisionally filed. The motions to restrict at **(# 104, 107)** are **DENIED**. Because no documents were placed under provisional restriction as a result of these motions, no further action is necessary. Ms. Bragg's Motion to Supplement **(# 108)** her summary judgment response is **DENIED AS MOOT**, as the proposed supplementation would not alter the analysis set forth herein. Ms. Bragg's Motion to Voluntarily Dismiss **(# 110)** her wrongful discharge claim is **GRANTED** and that claim is **DISMISSED**. The motions or other materials at **(# 124, 125, 140, 145, 164, 172, 176,** and **180)** are **DENIED AS MOOT**. Any documents filed under provision restriction pursuant to these motions shall retain that status.

Dated this 18th day of September, 2020.

**BY THE COURT:**

*Marcia S. Krieger*
_____

Marcia S. Krieger
Senior United States District Judge